[Cite as *In re A.R.*, 2025-Ohio-4378.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE A.R.

A Minor Child

[Appeal by C.M., Mother]

:
:
:
:
:
:

No. 114855

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 18, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22911194

---

***Appearances:***

Judith M. Kowalski, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

---

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant C.M. ("Mother") challenges the judgment of the juvenile court terminating her parental rights and awarding permanent custody of her minor child, A.R., to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). She raises three assignments of error for our review:

1. The trial court erred by failing to hold an in-camera interview with the subject child.

2. The evidence was insufficient to support permanent custody of the child to the Cuyahoga County Division of Children and Family Services.

3. The decision to grant permanent custody was against the manifest weight of the evidence.

{¶ 2} After a thorough review of the applicable law and facts, we affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 3} In November 2022, CCDCFS filed a complaint seeking temporary custody of A.R. [1] (d.o.b. 10/25/09), arising from issues of Mother's substance abuse and her inability to parent A.R.[2] The complaint alleged that A.R. was neglected and dependent and requested temporary custody to the agency. The complaint further noted that Mother had four other children who had been adjudicated dependent due in part to Mother's substance abuse. Emergency custody of A.R. was granted to CCDCFS.

{¶ 4} The court held a hearing on the motion for temporary custody, after which A.R. was adjudicated neglected and dependent, and temporary custody was awarded to the agency.

---

[1] A sibling of A.R. was also named in the complaint but is not a subject of this appeal.

[2] Father was represented by counsel at the below proceedings but did not appear. He is not party to this appeal.

{¶ 5} In January 2024, the agency moved for permanent custody of A.R. Mother moved for an in-camera interview of A.R. and also moved for legal custody of A.R. to be awarded to Mother's great aunt.

{¶ 6} The court held a hearing on the motions where the agency presented the testimony of the case manager assigned to A.R.'s case. The case manager testified that the agency's concerns with Mother related to substance-abuse issues, housing, and parenting. He outlined the various treatment programs to which Mother had been referred and concerns that the agency had about Mother's "ability to make appropriate decisions." (Dispositional hearing tr. 32.)

{¶ 7} The case manager stated that Mother had been referred to three treatment providers in the prior two years — New Visions, St. Vincent Catholic Charities ("St. Vincent"), and Attain — but had not successfully completed any of the programs. When Mother was working with New Visions, she had signed a release of information, allowing the agency to obtain progress reports. She had also signed a release when she was working with St. Vincent, but when that program ended, she revoked the release and did not sign a new one. The case manager testified that following the program at St. Vincent, the agency made efforts to have constant communication with Mother but was actually only speaking with her "minimally." (*Id.* at 23.) The case manager further noted that following the St. Vincent program, Mother had given birth to another child, who had tested positive for cocaine at birth.

{¶ 8} With regard to the parenting issue, the case manager acknowledged that Mother had completed a parenting class in spring or summer of 2023. Mother

had supervised visits with her children, and the case manager stated that he had witnessed Mother "doz[ing] off" when she was visiting the baby and "screaming at the top of her lungs" during visitation with the older children. (*Id.* at 32-33.) Mother's visits with the children had previously been weekly but began tapering off until A.R. declined to visit with Mother at all. Visits were changed to biweekly but Mother had not been consistent.

{¶ 9} The case manager was asked on cross-examination if Mother had housing that would accommodate A.R. The case manager stated that he did not know. He had only been inside the house as far as the foyer because Mother would not let him in further. (*Id.* at 38.) He acknowledged that the residence seemed "large enough" to accommodate Mother and A.R. but could not say if it was suitable. He noted that he had never seen the lease relating to Mother's residence.

{¶ 10} He further testified about A.R., stating that she was able to articulate her thoughts "very well" and that A.R. has stated that she does not want to live with Mother and liked her current placement. (*Id.* at 30.) He maintained that A.R.'s current needs were being met in her placement and that it would not be in her best interest to move her from there.

{¶ 11} Mother presented the testimony of a case manager and life skills coach from Northern Ohio Recovery Association ("NORA"). The NORA case manager testified that he had started working with Mother in October 2024. Mother had been attending courses at NORA in life skills and, as of the date of the hearing, was due to receive her certificate the following week.

{¶ 12} On cross-examination, the NORA case manager acknowledged that he had not seen Mother's home and did not know if she had food, clothing, or other basic needs for a child. He further stated that Mother had not come to NORA for parenting skills.

{¶ 13} Mother also presented the testimony of her counselor at NORA, who worked with Mother on her substance-abuse issues. She stated that Mother had initially come to NORA in July 2024 for two months and then came back in October 2024 and had remained engaged with services as of the day of trial. The counselor testified that Mother had had weekly negative urine screens since October 2024. She stated that she sent Mother's progress reports to the case worker at CCDCFS. Mother's exhibit B was one such progress report, which showed that she had been meeting her goals and objectives in her treatment plan at NORA.

{¶ 14} Mother's final witness was Mother's great aunt, to whom Mother had asked the court to award legal custody of A.R. She testified as to her housing situation and about time she had spent with A.R. throughout her life. On cross-examination, though, she acknowledged that she had not really talked to A.R. in the year prior and that she did not know where A.R. wanted to reside.

{¶ 15} The guardian ad litem ("GAL") also testified and presented her report and recommendation. She testified that she had visited Mother in her home and that the home was appropriate. The GAL also stated that she had met with A.R. and spoke with her about her wishes. She maintained that A.R. loved her parents but liked her foster home and that she believed that her foster mother would give her

the skills that she needed. She further testified that she had asked A.R. if she wanted permanent custody to go to the agency and she had stated yes. The GAL concluded that awarding permanent custody to the agency was in A.R.'s best interest.

{¶ 16} Pursuant to Mother's request, the court scheduled an in-camera interview via Zoom with A.R. On the day of the scheduled interview, the court noted on the record that A.R. had not appeared for the interview via Zoom, although she had been duly notified. The case manager from CCDCFS stated that at his last visit with A.R. the month prior, A.R. had stated that she did not want to "com[e] before the camera." (Feb. 3, 2025 hearing tr. 6.) The GAL also noted that she had spoken to A.R. on several occasions about speaking to the court, but that A.R. did not wish to do so and that she entrusted the GAL to inform the court of her wishes. The case manager further stated that A.R. had said that she "liked it where she is [and did] not want to leave" and did not "want to be with anybody besides [her foster mother]." (*Id.*)

{¶ 17} The court stated on the record that the motion for in-camera interview was granted in part. It further noted that the interview had been scheduled but all necessary parties had not been present. The court later stated in a judgment entry that "the child refused/declined to participate in the in[-]camera interview held by the court." (Feb. 5, 2025 Judgment Entry p. 1.)

{¶ 18} The trial court granted permanent custody to the agency, finding that (1) Mother had continuously and repeatedly failed to substantially remedy the conditions causing A.R. to be removed; (2) Mother's chronic chemical dependency

was so severe that she was unable to provide an adequate permanent home for A.R.; (3) Mother had demonstrated a lack of commitment toward A.R. by failing to regularly support, visit or communicate with her; (4) Mother placed A.R. at substantial risk of harm two or more times due to her abuse of alcohol or drugs and had rejected treatment or refused to participate in further treatment after a case plan requiring treatment had been issued; (5) Mother had had her parental rights terminated with respect to a sibling of A.R. and had failed to prove that she can provide a secure permanent placement for the health, welfare, and safety of A.R.; (6) Mother was unwilling to provide food, clothing, shelter, and other basic necessities for A.R. or to prevent her from suffering physical, emotional, or sexual abuse, or physical, emotional, or mental neglect; and (7) Mother had caused or allowed A.R. to suffer neglect and the seriousness, nature, or likelihood of recurrence of the abuse or neglect made placing A.R. with Mother a threat to A.R.'s safety.

{¶ 19} The court further found that A.R. had been in the agency's custody for two years and no longer qualified for temporary custody and that A.R. could not or should not be placed with Mother within a reasonable period of time.

{¶ 20} With regard to the motion for legal custody to Mother's great aunt, the court determined that granting her legal custody was not in A.R.'s best interest. The court ultimately found, by clear and convincing evidence, that A.R.'s return to Mother's home would also be contrary to A.R.'s best interest and granted permanent custody to the agency.

{¶ 21} Mother then filed the instant appeal.

## II. Law and Analysis

{¶ 22} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "fundamental liberty interest . . . in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The termination of parental rights is regarded as "'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.,* 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14. Thus, parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 23} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.,* 2022-Ohio-529, ¶ 49 (8th Dist.). "'[T]he natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 24} All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). When parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency

for children." *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), citing *In re Howard*, 1986 Ohio App. LEXIS 7860, *5 (5th Dist. Aug. 1, 1986).

{¶ 25} Ohio statutes governing child custody and protection "'appropriately reflect the need to balance . . . [the] parents' . . . interest in the custody, care, nurturing, and rearing of their own children, and the State's parens patriae interest in providing for the security and welfare of children under its jurisdiction[.]'" *In re P.S.*, 2023-Ohio-144, ¶ 26 (8th Dist.), quoting *In re Thompson*, 2001 Ohio App. LEXIS 1890 (10th Dist. Apr. 26, 2001).

### A.  In-Camera Interview

{¶ 26} In her first assignment of error, Mother argues that the trial court erred by failing to conduct an in-camera interview with A.R. pursuant to Mother's request.  Mother asserts that under R.C. 3109.04(B)(1), the court was required to interview A.R. when making a custody determination.  Mother argues that the Supreme Court of Ohio has held that when the juvenile court makes a custody determination under R.C. 2151.353, it is required to comply with R.C. 3109.04, citing *In re Poling,* 64 Ohio St.3d 211 (1992).

{¶ 27} However, Mother misinterprets *Poling* and her reliance on a domestic relations statute is misplaced.  In *Poling*, the Court held:

> [W]hen a juvenile court seeks to exercise its concurrent jurisdiction in a situation such as before us, i.e., where there is an existing custody decree, the juvenile court must do so in compliance with R.C. 2151.23(F)(1).  This statute requires that "[t]he juvenile court shall exercise its jurisdiction in child custody matters *in accordance with sections 3109.04*, 3109.21 to 3109.36, * * * of the Revised Code."

(Emphasis added.) Therefore, when a juvenile court makes a custody determination, it must do so "in accordance with R.C. 3109.04."

*Id.* at 216.

{¶ 28} In this case, there was no existing custody decree, and consequently, the juvenile court was not exercising concurrent jurisdiction. Thus, the juvenile court was not required to comply with R.C. 3109.04.

{¶ 29} R.C. 2151.414(D)(1)(b) provides that the trial court must consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem." In her brief, Mother stresses that A.R. was of an age to communicate her wishes to the court and that it was "important" for the court to know how A.R. feels about her situation. Mother states that it was "imperative" that the court speak to A.R. to determine what is in the child's best interest.

{¶ 30} On the day of the scheduled in-camera interview via Zoom for which A.R. did not appear, Mother's counsel questioned the GAL as to whether she had spoken to A.R. about conveying her wishes to the court. The GAL stated that A.R. did not want to speak to the court and that she thought that it was the GAL's job to speak for her.

{¶ 31} Here, the court did not hear directly from A.R., but it was able to learn of her wishes through the GAL. The trial court was not required to hold an in-camera interview of the child, and Mother's first assignment of error is overruled.

**B. Sufficiency of the Evidence/Manifest Weight of the Evidence**

{¶ 32} In her second and third assignments of error, Mother argues that the trial court's decision to terminate her parental rights and grant permanent custody of A.R. to the agency was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 33} The Supreme Court of Ohio has stated that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id*. at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id*. at ¶ 14.

{¶ 34} "Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re P.S.*, 2023-Ohio-144, at ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.).

{¶ 35} R.C. 2151.414 provides a two-prong analysis to be applied by the juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e). "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent

custody to an agency." *In re D.H.,* 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.,* 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 36} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 37} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.,* 2014-Ohio-2051, ¶ 28 (8th Dist.), quoting *Cross v. Ledford,* 161 Ohio St. 469, 477 (1954).

### 1. First Prong – R.C. 2151.414(B)

{¶ 38} With regard to the first prong of the permanent-custody analysis, the court determined that A.R. had been in the custody of the agency for 12 or more months of a consecutive 22-month period and that A.R. should not or could not be placed with Mother within a reasonable time. The latter finding was based on several factors in R.C. 2151.414(E).[3]

---

[3] "When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E)." *In re L.H.,* 2024-Ohio-2271, ¶ 34 (8th Dist.), citing *In re A.V.,* 2014-Ohio-5348, ¶ 58 (8th Dist.), *In re R.M.,* 2012-Ohio-4290, ¶ 14 (8th Dist.), and *In re B.P.,* 2019-Ohio-2919, ¶ 13 (8th Dist.). If the court finds, by clear and convincing evidence that at least one of the enumerated factors exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents. R.C. 2151.414(E).

{¶ 39} On appeal, Mother appears to only challenge the trial court's determination that A.R. could not be placed with her in a reasonable timeframe, based upon factors in R.C. 2151.414(E)(2) and (E)(9), to wit: Mother's chronic chemical dependency was so severe that it placed A.R. at substantial risk of harm and that Mother had rejected treatment or refused to participate in treatment two or more times after treatment was required by her case plan.

{¶ 40} However, clear and competent evidence within the record supports the trial court's finding under R.C. 2151.414(B)(1)(d): A.R. was placed in the emergency temporary custody of CCDCFS in November 2022, and she had remained in CCDCFS's continuous, temporary custody at the time of the hearing in January 2025. Mother does not dispute this finding. Because only one factor is needed, the first prong of the two-part analysis is satisfied and we need not consider the trial court's findings under R.C. 2151.414(B)(1)(a), regarding whether A.R. should not or could not be placed with Mother in a reasonable time.

### 2. Second Prong – Best Interest of the Child

{¶ 41} Having determined that competent and credible evidence existed to support the first prong, we now turn to the second prong of our analysis. This prong requires the court to determine, by clear and convincing evidence, whether the order granting permanent custody of A.R. to the agency pursuant to R.C. 2151.414(D) is in the best interest of the child.

{¶ 42} In determining the best interest of the child under R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors, including

but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 43} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.), citing *In re Moore*, 2000 Ohio App. LEXIS 3958 (8th Dist. Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683 (3d Dist. 1993).

{¶ 44} R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). "Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31. And, as previously stated, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest.

**{¶ 45}** Here, the juvenile court considered the evidence and testimony presented at the hearing, as well as the GAL's report, and specifically referenced the R.C. 2151.414(D)(1) factors in its decision. The court further found that A.R.'s return to Mother's home would be contrary to her best interest.

**{¶ 46}** On appeal, Mother disputes these findings, arguing that testimony from the GAL indicated that A.R. wished to maintain a relationship with her parents. In addition, Mother contends that the three witnesses she presented were "highly credible and offered substantial evidence to support her case-plan compliance and her progress at achieving stability."

**{¶ 47}** It is clear that the GAL had spoken with A.R. and conveyed her wishes about custody. A.R. clearly stated to the GAL that she wanted to stay in her foster home. Thus, we find that the court properly considered the wishes of the child in determining her best interest.

**{¶ 48}** Finally, even if this court were to accept Mother's position that she substantially complied with her case plan by engaging in services at NORA, we note that Ohio courts have routinely held that a parent's compliance with his or her case plan is not necessarily dispositive on the issue of reunification. *See In re S.C.*, 2015-Ohio-2280, ¶ 40 (8th Dist.) ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification."); *In re R.L.*, 2014-Ohio-3117, ¶ 34 (9th Dist.) ("[A]lthough case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it.").

{¶ 49} "'Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, "it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights."'" *In re N.T.*, 2023-Ohio-1291, ¶ 46 (8th Dist.), quoting *In re W.C.J.*, 2014-Ohio-5841, ¶ 46 (4th Dist.), quoting *In re Gomer*, 2004-Ohio-1723, ¶ 36 (3d Dist.). Consequently, even if Mother had complied with her case-plan requirements, which it does not appear that she had, her compliance, standing alone, would not have necessarily demonstrated that she had substantially remedied the conditions that caused A.R.'s removal or that reunification was in A.R.'s best interest.

{¶ 50} We cannot say that the juvenile court lost its way in its resolution of evidentiary conflicts and created a manifest miscarriage of justice. The juvenile court's judgment entry granting permanent custody of A.R. to the agency demonstrates that the court considered the factors outlined in R.C. 2151.414(D)(1), and the court's findings are supported by competent, credible evidence.

{¶ 51} Therefore, Mother's second and third assignments of error are overruled.

{¶ 52} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

---

EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
ANITA LASTER MAYS, J., CONCUR